# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Leonard N. Anderson,

                Plaintiff,

v.

Ed Smith, in his individual capacity and his
official capacity for his conduct under color
of law, in the course and scope of his
employment, as a City of St. Paul,
Department of Safety Inspections Employee,
and City of St. Paul, a political subdivision
of the state of Minnesota,

                Defendants.

File No. 18-cv-01885 (ECT/ECW)

**MEMORANDUM OPINION
AND ORDER**

---

Peter J. Nickitas, Peter J. Nickitas Law Office, Minneapolis, MN, for plaintiff Leonard N.
Anderson.

Megan D. Hafner and Judith A. Hanson, Saint Paul City Attorney's Office, Saint Paul,
MN, for defendants Ed Smith and City of Saint Paul.

---

Plaintiff Leonard N. Anderson is a St. Paul resident whose home and yard (the

"Property"), due to concerns about their condition, have been the subject of many

enforcement activities by the defendant City of St. Paul. Though not directly relevant to

this case, Anderson alleges, and public records confirm, that his relationship with the City

has been quarrelsome for quite some time. *See* First Am. Compl. ("Am. Compl.") ¶¶ 17,

28–29 [ECF No. 27]; *see also Anderson v. City of St. Paul*, No. 15-cv-1636 (PJS/HB), 2016

WL 614384, at *1 (D. Minn. Feb. 16, 2016) [hereinafter "*Anderson I*"] (summarizing

Anderson's relationship with the City). In this case, Anderson alleges that a subset of

enforcement actions undertaken by the City and co-defendant Ed Smith, a City employee in the Department of Safety and Inspections, violated several of Anderson's federal constitutional rights and certain state statutory and common-law rights. Defendants seek dismissal of Anderson's claims under Federal Rules of Civil Procedure ("Rules") 12(b)(6) and 12(c). Anderson's federal constitutional claims will be dismissed because they are not plausibly pleaded. Anderson's state-law claims will be dismissed because those claims lack an independent basis for federal jurisdiction, and the better choice is not to exercise supplemental jurisdiction over those claims given dismissal of the federal claims at this early stage of the proceedings.

## I[1]

## A

On September 29, 2014, the City inspected Anderson's property, and on the same day, it issued a correction notice informing Anderson that the inspection had revealed thirty-three alleged "deficiencies" that "violat[e] . . . the Saint Paul Legislative Code." Am. Compl., Ex. A (footnote omitted); *see also id.* ¶ 30. The deficiencies identified in that correction notice included items such as replacing or repairing roofing in specific areas, repairing or weather-sealing siding and other areas of the exterior, submitting a design for re-grading in one area to address a drainage issue, and making various other repairs to, or replacements of, parts of the building, among other items. *Id.*, Ex. A at 2. The notice

---

[1] In describing the relevant facts and resolving this motion under Rules 12(b)(6) and 12(c), all factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in Anderson's favor. *See Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009).

further informed Anderson that he must "correct[ ]" each alleged deficiency before the City's re-inspection, which would occur on or after November 18, 2014, or else face potential criminal charges, a civil lawsuit, or abatement or assessment by the City. *Id.*, Ex. A at 1.

Anderson appealed the September 29, 2014 correction notice, and—according to Anderson—he and the City resolved the issues raised in the notice by "stay[ing] and suspend[ing] . . . on one condition, and no other—that Mr. Anderson list his [Property] for sale." *Id.* ¶ 31; *see* Aff. of Megan D. Hafner ("Hafner Aff."), Ex. 1 [ECF No. 38]. Anderson further alleges that Defendants "did not impose, either in written or oral communication, a condition that if he failed to sell [the Property], that [Defendants] would revive their correction proceedings against him." Am. Compl. ¶ 34. In fact, the City resolution describing the terms under which the City agreed to address Anderson's appeal was approved by the Saint Paul City Council and signed by the mayor on November 5, 2014, and provides in part as follows:

> WHEREAS, the Legislative Hearing Officer recommends that the City Council grant [an extension of approximately one year] until November 1, 2015 for compliance with the correction order dated September 29, 2014, if the following conditions are met:
>
> 1) the property must be listed for sale by November 17, 2014;
>
> 2) there shall be quarterly reports to the Legislative Hearing Officer detailing the progress in the sale, including a list of showings and offers; and
>
> 3) all repairs undertaken shall be made under permit; Now, Therefore, Be It

> RESOLVED, that the Saint Paul City Council hereby accepts and adopts the Legislative Hearing Officer's recommendation in this matter.

Hafner Aff., Ex. 1.[2]

Anderson alleges that he did list the Property for sale at some point in 2014, but that it did not sell, despite his diligent efforts. Am. Compl. ¶¶ 32–33. He also alleges that he "hired a contractor to make repairs to the roof of his dwelling, conformably to the 33 point discrepancy notice." *Id.* ¶ 35.

## B

On July 10, 2015, Anderson received a "Summary Abatement Order" (dated July 7) ordering him to "cut and remove tall grass, weeds and rank plant growth throughout" the Property. *Id.* ¶ 62. Anderson's Property includes wetland areas, with cattails, tall water plants, and wild water grass, but he alleges that the abatement order otherwise "has no basis in the objective reality that natural persons of ordinary intelligence and command of their respective five senses perceive." *Id.* ¶¶ 64, 66. According to Anderson, no one has ever complained that his Property constituted a public or private nuisance, and that moreover the City has never taken any action to cut or remove tall grasses, thistles, and weeds growing on other, public property on the East Side of Saint Paul. *Id.* ¶¶ 63, 65. Nevertheless, on July 14, 2015, Smith and numerous Saint Paul police officers arrived at Anderson's Property to destroy vegetation pursuant to the Summary Abatement Order. *Id.*

---

[2]   Because the resolution is a public record, it may be considered in resolving Defendants' motion to dismiss without converting the motion into one for summary judgment. *See Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

¶ 69.  But a number of people intervened, and Smith and the officers left the Property without carrying out any abatement activities.  *Id.* ¶ 70.

## C

At some point after the aborted abatement activities, Anderson learned of the existence of a City-run website that contained information about certain actions the City has undertaken with respect to the Property.  *Id.* ¶ 71.  Of primary relevance to this action is a statement on that website that the Property's "[i]nterior is unsafe/uninhabitable"—a statement Anderson maintains is false.  *Id.* ¶¶ 74, 78.  The website lists October 10, 2011 as the date of both the complaint and the initial inspection, with periodic updates from November 19, 2014 through July 21, 2015 briefly describing subsequent inspections or "[r]echeck[s]."  *Id.* ¶¶ 74–75.  At least one of those inspections was attributed to Inspector 325, meaning Smith.  *Id.* ¶ 74.  Anderson alleges generally that he has "exercis[ed] reasonable effort to persuade the Defendants to correct, eliminate, retract, and mitigate" the allegedly false statements on the website, but the City has not removed them.  *Id.* ¶ 83.  According to Anderson, the website's content regarding the Property was "a contributing factor" in preventing Anderson from selling the Property.  *Id.* ¶ 128.

## D

On May 25, 2018, Smith sent Anderson a second correction notice that included all the same alleged deficiencies identified in the September 29, 2014 correction notice, plus a new, thirty-fourth item alleging that Anderson unlawfully built a berm on his own property using fifty cubic yards of dirt that eroded onto the property of his neighbor to the north.  *Id.*, Ex. B; *see also id.* ¶¶ 37–39.  Smith, Anderson claims, issued the notice "as the

direct result of" a complaint received from Anderson's northerly neighbors. *Id.* ¶ 50. Apparently unbeknownst to Smith, Anderson had previously sued those neighbors over a dispute involving an unlicensed tree cutter the neighbors had hired whose work had allegedly damaged trees on Anderson's Property. *Id.* ¶¶ 52–53.

It is not entirely clear from the First Amended Complaint whether Anderson disputes that any soil from his berm had eroded onto the neighboring property. *See id.* ¶¶ 40–41 (alleging that coniferous trees he planted along the berm "anchor the berm soil"). But he does explicitly take issue with the berm-related deficiency in other respects. He alleges that Smith issued the 2018 correction notice without knowing the location of the relevant property line, the volume of the dirt forming the berm, or even "whether or not dirt actually eroded onto" the neighboring property. *Id.* ¶¶ 43–45. He alleges that Smith failed to undertake "even minimal investigation" of the Property and did not make "minimal contact with" Anderson or his counsel, *id.* ¶ 51, did not include any legal citation in the correction notice, *id.* ¶ 46, and issued the notice "without any imminent, pressing need" to do so, *id.* ¶ 49. Anderson alleges that Smith "willfully refused to make minimal investigation because of his pre-existing animus" against Anderson stemming from an instance in which Anderson sued Smith in 2015. *Id.* ¶ 54. Anderson further alleges that his neighbors to the north (the ones who complained about him to the City) and other nearby residents all have their own nonconforming structures and property-maintenance issues of one type or another, but have not similarly been subject to enforcement action by the City. *See generally id.* ¶¶ 7–10, 55–58; *id.*, Exs. D–L.

The 2018 correction notice gave Anderson 31 days—until June 28, 2018—to correct the enumerated deficiencies. *Id.*, Ex. B at 3; *see also id.* ¶ 60. Anderson considered that amount of time unreasonable given the extent of the work required and that the City controlled the issuance of any permits that would be required, *id.* ¶ 60, but Smith did not respond to Anderson's requests for an extension, *id.* ¶ 59. Anderson emailed Smith "photographic proof of the roof work after the repairs were made," *id.* ¶ 36, but does not allege that he addressed any of the deficiencies apart from the roof-related items. Anderson does not allege that the City has undertaken any further action with respect to the 2018 correction notice.

E

Anderson commenced this lawsuit eight days after the June 28 deadline to correct the deficiencies alleged in the 2018 correction notice. *See* Compl. [ECF No. 1]. He filed the now-operative First Amended Complaint in October 2018, alleging a variety of claims that stem from the 2018 correction notice, the 2015 abatement activities, and the City-run website. *See* Am. Compl.

With respect to the 2018 correction notice, Anderson alleges that Smith violated his right to procedural due process under the Fifth Amendment to the U.S. Constitution by issuing the 2018 correction notice and by not extending the 31-day deadline for complying with that notice. *Id.* ¶¶ 86–92 (Claim I). He further alleges that Smith violated his right to equal protection under the Fifth Amendment of the U.S. Constitution by selectively enforcing the City Code against him as a class of one. *Id.* ¶¶ 93–96 (Claim II). He also

brings a *Monell* claim against the City under the same due-process and equal-protection theories described against Smith under Claims I and II. *Id.* ¶¶ 97–99 (Claim III).

With respect to the 2015 abatement activities, Anderson alleges that Smith committed an unreasonable search of his Property, in violation of the Fourth Amendment of the U.S. Constitution, *id.* ¶¶ 101–05 (Claim IV), and retaliated against Anderson for a prior lawsuit against the City and other defendants, *id.* ¶¶ 111–18 (Claim VI, which alleges retaliation for Anderson's exercise of free speech, and Claim VII, which alleges retaliation for Anderson's "peaceful redress of grievances by access to the courts"). He further alleges that Smith and the City are liable for the common-law tort of trespass. *Id.* ¶¶ 106–10 (Claim V).

With respect to the City-run website, Anderson alleges that Smith and the City have committed "constitutional 'stigma plus' due process defamation," *see id.* ¶¶ 119–34 (Claim VIII), and that the dissemination of the statements via the website "violated [his] right to be the subject of truthful, accurate government data" under the Minnesota Data Practices Act, *id.* ¶¶ 135–38 (Claim IX).

Anderson brings all of his constitutional claims under 42 U.S.C. § 1983. *See id.* ¶¶ 86–105, 111–18.

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed,

they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The complaint must "state

a claim to relief that is plausible on its face." *Id.* at 570. A motion for judgment on the

pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss

under Rule 12(b)(6). *Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

## B

### 1

Anderson alleges that Smith violated Anderson's right to procedural due process

when he sent the 2018 correction notice, failed to provide the factual or legal basis for each

of the thirty-four alleged discrepancies identified in that notice, and refused to extend the

deadline by which Anderson was required to make the required repairs. *See generally* Am.

Compl. ¶¶ 86–92 (Claim I). A two-step process is used to analyze procedural due process

claims. First, a plaintiff must "demonstrate the deprivation of a protected liberty or

property interest." *Bonner v. Outlaw*, 552 F.3d 673, 676 (8th Cir. 2009) (citation omitted).

If the plaintiff does so, then "the amount of process due [the plaintiff] is determined by

balancing the specific interest affected, the likelihood the challenged action would result

in an erroneous deprivation of that right, and the burden of providing additional procedures,

including administrative costs and burdens." *Id.* (citations omitted). Where no protected

interest exists, a plaintiff cannot maintain a procedural due process claim. *See Hamilton v.*

*Brownlee*, 237 F. App'x 114, 115 (8th Cir. 2007) (per curiam) (unpublished table decision).

Defendants argue that that Court should dismiss Claim I because Anderson has not

identified any protected interest in connection with the 2018 correction notice. Mem. in

Supp. at 10 [ECF No. 37]. Mere receipt of a correction notice does not deprive the recipient of a protected liberty or property interest where the law does not require any hearing prior to issuance of the notice and it does not result in any seizure of property. *Walnut Hill Estate Enters., LLC v. City of Oroville*, 452 F. App'x 756, 758 (9th Cir. 2011) (unpublished table opinion); *see also Nikolas v. City of Omaha*, 605 F.3d 539, 545, 547 (8th Cir. 2010) (no procedural due process right implicated by city placing a placard on plaintiff's garage declaring structure was "determined to be unsafe, unfit for human occupancy, or unlawful"). Similar to the notices in *Walnut Hill Estate* and *Nikolas*, Anderson does not allege any facts from which the Court could infer that the issuance of the correction notice, its contents, or the deadline for compliance deprived him of any property or liberty interest. Notably, Anderson does not allege that the City took any action against him following the issuance of the 2018 correction notice. In his brief, Anderson does not respond to Defendants' arguments in favor of dismissing Claim I. *See* Mem. in Opp'n [ECF No. 44]. For these reasons, Anderson's procedural due process claim will be dismissed.

## 2

In Claim II, Anderson alleges that Smith intentionally disregarded various Code violations by Anderson's neighbors and selectively enforced the Code only against Anderson, thereby violating his right to equal protection of the law. "The threshold inquiry in [the class-of-one] equal protection [claim . . .] is whether the [plaintiff is] similarly situated to others who allegedly received preferential treatment." *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015) (first two alterations in original) (citing *Domina v. Van Pelt*, 235 F.3d 1091, 1099 (8th Cir. 2000)). A plaintiff who cannot make such a threshold

showing does not have a viable equal protection claim. *Robbins*, 794 F.3d at 996 (citation omitted). "'To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects.'" *Id.* (quoting *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)). "Identifying the disparity in treatment is especially important in class-of-one cases." *Barstad v. Murray Cty.*, 420 F.3d 880, 884 (8th Cir. 2005) (citation omitted). "A class-of-one plaintiff must therefore 'provide a specific and detailed account of the nature of the preferred treatment of the favored class,' especially when the state actors exercise broad discretion to balance a number of legitimate considerations." *Nolan v. Thompson*, 521 F.3d 983, 990 (8th Cir. 2008) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214–15 (10th Cir. 2004)). Anderson has not alleged facts establishing that his situation is identical or directly comparable to those of his neighbors whose Code deficiencies he alleges the City deliberately overlooked.

First, he alleges only one or a small handful of instances of noncompliance or wrongful acts by each neighbor he claims is similarly situated. *See* Am. Compl. ¶¶ 6(a), 48, 58 (neighbors Thompson and Valley), ¶¶ 7(b), 56 (neighbor Darmer), ¶¶ 8(c), 57 (neighbor Olsen), ¶¶ 9(d), 55 (neighbors Matter). By contrast, Anderson was cited in 2018 for almost three dozen deficiencies. *See id.* ¶¶ 37–38. Even if he had corrected all of the roof-related deficiencies before the 2018 correction notice was issued—and the First Amended Complaint is at least ambiguous with respect to that question of timing, *see id.* ¶¶ 35–36—and if the berm deficiency alleged in the 2018 correction notice lacked any factual basis—a question on which, again, the First Amended Complaint is at least

ambiguous, *see id.* ¶¶ 41, 43–46—the 2018 correction notice lists roughly two dozen other deficiencies for which Anderson has not challenged the factual basis. *Id.*, Ex. B. The number of issues the City identified at his Property far exceeds the number of deficiencies he identifies at any of the neighboring properties whose owners he says are similarly situated. Based solely on the number of deficiencies at issue on the various properties, he is not situated similarly to his neighbors.

Second, and relatedly, the deficiencies Anderson has identified at his neighbors' properties are not similar in type to the deficiencies Smith identified with respect to Anderson's Property. The 2018 correction notice identifies numerous issues at Anderson's Property involving, among other things, siding or cladding, weather sealing or caulking, doors, grading, and framing that required repair or replacement. *See generally id.* Those deficiencies are not of the same or a similar nature as the problems Anderson points to on his neighbors' land, which include such disparate allegations as having a trailer with expired tabs, *id.* ¶ 57, allowing raccoons to shelter in a hollow tree, *id.* ¶ 58, and having engaged in various forms of misconduct within the neighborhood, *see id.* ¶¶ 6(a) (theft of metal fence), 7(b) (trespass on Anderson's Property to cut his trees and starting a fire that caused embers to strike structures and items on Anderson's Property).

Third, Anderson pleads no facts suggesting that any of his neighbors' histories of compliance disputes with the City go back years, as his unquestionably do, further suggesting that they are not similarly situated to Anderson. The City may have merely decided to more closely scrutinize deficiencies at a property with a long history of

compliance issues than those at nearby properties without that particular enforcement history.

Fourth, several of the issues Anderson identifies with respect to his neighbors involve conduct not by Smith but by officers of the Saint Paul Police Department. *See id.* ¶¶ 6(a)–7(b). A failure by law enforcement to refer trespass or property-damage complaints for prosecution or to issue citations for such issues, for example, does not render the offending neighbors similarly situated to Anderson with respect to actions by Smith.

Furthermore, the 2018 correction notice is an act of "discretionary decisionmaking based on a vast array of subjective, individualized assessments," of the type not generally susceptible to a class-of-one theory. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008). The Eighth Circuit has rejected such a claim under similar circumstances to those at issue here. In *Novotny v. Tripp County*, it addressed a class-of-one claim brought by a plaintiff who alleged that the county's weed ordinances were selectively enforced against him. 664 F.3d 1173, 1178 (8th Cir. 2011). But because the enforcement of such ordinances "was based on a number of subjective factors within the purview of the . . . officials' discretionary authority," *id.* at 1179 (footnote and citation omitted), the plaintiff could not maintain a class-of-one claim. The weed ordinances at issue in *Novotny* are indistinguishable from the issues addressed in the 2018 correction notice at issue here. For that additional reason, Anderson has not adequately pleaded a class-of-one equal protection claim.

Anderson asserts a *Monell* claim against the City based on the same underlying constitutional violations he asserts against Smith in Claim I (for procedural due process) and Claim II (for equal protection). *See* Am. Compl. ¶¶ 97–98. For the same reasons those claims against Smith fail, his *Monell* claim against the City also fail. More fundamentally, however, to maintain a claim against the City under § 1983, Anderson would have to plead that the City had adopted some policy, custom, or practice and that the policy, custom, or practice was the moving force behind a violation of his rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In his First Amended Complaint, he points to no City policy, custom, or practice at all, much less one related to the constitutional violations he alleges he suffered. *See* Am. Compl.

4

Defendants argue that none of Anderson's constitutional claims involving the 2015 abatement activities can survive because Anderson failed to plausibly plead that Smith's actions constituted an unreasonable search. Mem. in Supp. at 20–22. In response, Anderson largely recites the facts alleged in his First Amended Complaint, and seems to argue that the sheer fact that Smith entered the Property without a warrant, Anderson's consent, or exigent circumstances necessarily violated the Fourth Amendment. Mem. in Opp'n at 16.

Anderson has not pleaded sufficient facts to support a claim that Smith conducted an unreasonable search of the Property. Although under some circumstances a warrant is required even for administrative searches—for example, a search of the interior of a

residence by a public-health official to determine compliance with a municipal housing code, *Camara v. Mun. Court of S.F.*, 387 U.S. 523, 526, 534 (1967), or a search of a property performed after a fire is extinguished to determine the cause of the blaze, *Michigan v. Tyler*, 436 U.S. 499, 511 (1978)—not every entry by an official onto private property implicates the Fourth Amendment.

Whether a search of an area surrounding a private residence violates the Fourth Amendment's protections depends on whether the individual invoking the right has a legitimate expectation of privacy in the area subject to the search. *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) (citation omitted). More specifically, it is lawful for a city code inspector to enter an ungated property without a warrant, proceed up the driveway to the front door, and observe his surroundings as he does so. *Nikolas*, 605 F.3d at 546 (citations omitted). If, in so doing, he sees an apparent code violation and looks in the window of a detached, non-dwelling structure "to confirm or refute the apparent violation," that activity also is lawful. *Id.* But Anderson does not allege any facts concerning Smith's conduct from which the Court could infer that Smith deviated from the constitutionally permissible—lawfully entering, proceeding along the driveway to Anderson's house, and then leaving following objections raised by Anderson and others.

Anderson's retaliatory-search claims against Smith (Claims VI and VII) should be dismissed for the additional reason that he has not plausibly pleaded retaliation *by Smith*. He alleges that Smith searched the Property in retaliation for Anderson suing Smith, the City, and a third defendant in *Anderson I*. Am. Compl. ¶¶ 112, 116. But, in fact, Smith was never named as a defendant in *Anderson I*, and does not appear to even be mentioned

in that complaint. *See* Compl., *Anderson v. City of St. Paul*, No. 15-cv-01636 (PJS/HB) (D. Minn. Mar. 30, 2015), ECF No. 1. Here, Anderson has not at all (much less plausibly) explained why, in 2015, *Smith* would have retaliated against Anderson for suing *a third party*. To survive a motion to dismiss, Anderson must plead more than mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555)), and the Court need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Anderson has not plausibly pleaded that Smith's work pursuant to the 2015 abatement was in any way retaliatory.[3]

5

Smith makes two main types of arguments as to why Anderson's stigma-plus defamation claim should be dismissed. First, he contends that because the allegedly defamatory statement that the Property's interior was unsafe or uninhabitable was originally published more than six years ago, it is therefore untimely under the applicable statute of limitations. Mem. in Supp. at 24; *Egerdahl v. Hibbing Cty. Coll.*, 72 F.3d 615, 618 n.3 (8th Cir. 1995) ("In Minnesota, § 1983 claims are governed by the six-year limitations period of Minnesota's personal-injury statute." (citations omitted)). Second,

---

[3]     Anderson's First Amended Complaint also references two unsuccessful condemnation actions against his property and one action to declare his property vacant, Am. Compl. ¶ 29, and his opposition brief cites a number of additional legal actions he has been involved in related to the state of his Property, *see* Mem. in Opp'n at 8–9 (referencing specific proceedings). But Anderson has not suggested here that Smith had any involvement in those actions, much less that any work Smith undertook with respect to the 2015 abatement activities could somehow have been in retaliation for any position Anderson might have taken in any of those proceedings.

Smith contends Anderson has not sufficiently alleged the required elements of a stigma-plus defamation claim. Mem. in Supp. at 25. Although it is not clear from the face of Anderson's complaint that his defamation claim is untimely, his stigma-plus claim will be dismissed because he has failed to state a viable claim on that theory.

The City's website includes a number of updates about subsequent inspections of the Property which appear to have been made in 2014 and 2015, *see* Am. Compl. ¶¶ 122–123, but the only statement on the website which Anderson alleges was false is that the Property's "[i]nterior is unsafe/uninhabitable," *id.* ¶¶ 122, 125. That statement was first published in 2011, more than six years before Anderson filed the original complaint in this matter. *Compare* Am. Compl. ¶ 122 *with* Compl. at 22 (bearing a filing date of July 6, 2018). Anderson contends that his stigma-plus defamation claim is nevertheless timely because the website was updated in 2014,[4] which falls within the limitations period. Mem. in Opp'n at 21. Defendants do not squarely address that argument in their reply. *See* Reply Mem. at 6 [ECF No. 46].

In general, Minnesota assesses the timeliness of defamation claims using the single-publication rule, under which the statute of limitations runs from the date on which the allegedly defamatory statement was first published. *Church of Scientology of Minn. v. Minn. State Med. Ass'n Found.*, 264 N.W.2d 152, 155 (Minn. 1978). Numerous more

---

[4]     The First Amended Complaint appears to include information added as late as July 2015, *see* Am. Compl. ¶ 122 ("Inspection Results (most recent first); 07/14/2015: Maintenance – Interior (Recheck) . . . .") but the difference is immaterial given that, if Anderson's republication theory is correct, either date would put the website content within the limitations period.

recent cases in Minnesota and elsewhere continue to apply the single-publication rule to online publications where the same content is continuously available. *See, e.g.*, *Shepard v. TheHuffingtonPost.com, Inc.*, No. 12-cv-1513 (PAM/SER), 2012 WL 5584615, at \*2 (D. Minn. Nov. 15, 2012) (interpreting Minnesota law and collecting cases from other jurisdictions). Yet *Shepard* concerned an online publication in which "the content of the article does not appear to have changed" over time, and the only alleged "updates" to the publication were the addition of new articles to the website that included links to the original, allegedly defamatory publication. *Id.* (citation omitted). Some authority recognizes that a statement made online may be republished—and thereby re-start the statute of limitations—if the previously published "statement itself is substantively altered or added to, or the website is directed to a new audience," *Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012), and in an unpublished affirmance of the district court opinion in *Shepard*, the Eighth Circuit cited that holding favorably, 509 F. App'x 556, 556 (per curiam) (citing *Yeager*, 693 F.3d at 1082).

Accordingly, the relevant timeliness question here appears to be whether the updates made in 2014 and 2015 "substantively altered or added to," *Yeager*, 693 F.3d at 1082, the 2011 statement that the Property's "[i]nterior is unsafe/uninhabitable," Am. Compl. ¶ 122. Taking Anderson's allegations as true and construing all reasonable inferences in his favor, the "updates" arguably suggest that, as a result of the "[r]echeck[s]" performed in 2014 and 2015, the City determined that its initial assessment—that the Property's interior was unsafe or uninhabitable—continued to hold true. Such a statement would constitute a substantive alteration of, or addition to, the originally published content that in 2011, the

Property was found to be unsafe or uninhabitable. Because, at this stage of the proceedings, it could be reasonably inferred that the 2011 statement Anderson alleges to be false was arguably substantively altered or added to in 2014 and 2015, it would be premature at this time to dismiss Anderson's stigma-plus claim as untimely.

But the stigma-plus defamation claim nevertheless fails on its merits. To adequately plead a stigma-plus claim under § 1983, Anderson must allege both damage to his reputation from Smith's false claim and some tangible effect on some liberty or property interest he possesses. *See Paul v. Davis*, 424 U.S. 693, 701 (1976). Smith argues that because the statement is about a structure on the Property rather than about Anderson himself, it cannot plausibly be understood to have damaged his reputation. Mem. in Supp. at 25. This argument splits hairs. At least in the context presented by this case, to say that someone lives in or owns an unsafe or uninhabitable structure might reasonably be understood to convey some negative factual understanding about that person, not just about the structure.

A closer question is presented by the second prong of the test. Anderson alleges that the statement on the website was a contributing factor in him being unable to sell his house—in other words, he is alleging that the website's statement made potential buyers less interested in buying the Property. Am. Compl. ¶ 128. Courts have taken differing views on the sufficiency of such claims. The Eighth Circuit has not addressed whether such a theory might be viable.

The apparent majority approach requires the "plus" factor to "be the result of state action directly affecting the plaintiff's rights or status under the law," not merely the result

of some third party's actions that may have been informed by the state's defamatory statements. *Sullivan v. N.J. Div. of Gaming Enf't*, 602 F. Supp. 1216, 1222 (D.N.J. 1985); *see, e.g.*, *Douglas v. Oregonian Pub. Co.*, 465 F. App'x 714, 715 (9th Cir. 2012) (unpublished table opinion); *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001) (citing *Paul*, 424 U.S. at 701–02, 710–11), *rev'd on other grounds sub nom. Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6–7 (2003). Similarly, the Second Circuit has further observed that "'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (alteration in original) (citation omitted). If the Court were to apply this apparent majority view, Anderson's stigma-plus claim would not be viable because the additional injury Anderson alleges results from the actions of unidentified potential buyers who opted not to buy his Property, and not from any City actor. By contrast, a minority view considers the "plus" requirement satisfied if the injury results from a third party's actions, and not directly from the state's action. *Marrero v. City of Hialeah*, 625 F.2d 499, 519 (5th Cir. 1980). Under that minority view, the type of harm Anderson alleges—harm suffered when third parties decided not to purchase the Property based in part on the statements on the City's website—might suffice.

But the Court concludes that the majority view is more faithful to the Supreme Court's articulation of the stigma-plus test in *Paul v. Davis*. In the portion of that decision grounding the "plus" requirement in precedent, the Supreme Court cited a number of cases in which the government was directly responsible not only in the stigmatizing speech but also for the non-reputational component of the injury, such as the denial of the right to

purchase liquor, *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), or the termination of, or loss of opportunity for, public employment, *Bd. of Regents v. Roth*, 408 U.S. 564 (1972); *United States v. Lovett*, 328 U.S. 303 (1946). *See Paul*, 424 U.S. at 701–09.

Smith has not argued any other basis for dismissal of the stigma-plus claim. He has not argued, for example, that the assessment that the Property's interior is unsafe or uninhabitable is an opinion, or that the harm alleged—that the statement on the website, rather than the condition of the Property itself, was "[o]n information and belief [. . .] a contributing factor in preventing [Anderson] from selling his [Property]," *see* Am. Compl. ¶ 128—was too conclusory and speculative to support a plausible claim. Although those bases might present alternative grounds for dismissing the stigma-plus claim, they are not addressed here.

B

Dismissals under Rule 12(b)(6) are commonly made with prejudice, *see Phoenix Entm't Partners, LLC v. Star Music, Inc.*, No. 16-cv-4078 (PJS/FLN), 2017 WL 5714021, at *5 (D. Minn. Nov. 28. 3017 (collecting cases)), and a with-prejudice dismissal is appropriate here with respect to Anderson's federal claims. Anderson amended his complaint once already. He did not request leave to amend his complaint in response to Defendants' motion. Finally, he neither identified nor suggested he could identify factual allegations that he might assert to overcome the deficiencies identified in Defendants' motion. Therefore all claims over which original jurisdiction exists will be dismissed.

At this early stage of proceedings, no interests of efficiency, fairness, or convenience would be served by exercising supplemental jurisdiction over Anderson's

state-law claims.  *See* 28 U.S.C. § 1367(c)(3); *Elmore v. Harbor Freight Tools USA, Inc.*, 844 F.3d 764, 767 (8th Cir. 2016) ("In exercising its discretion [regarding supplemental jurisdiction], the district court should consider factors such as judicial economy, convenience, fairness, and comity." (quoting *Brown v. Mort. Elec. Registration Sys., Inc.*, 738 F.3d 926, 933 (8th Cir. 2013)).  Those claims will be dismissed without prejudice to Anderson's right to re-file them in state court.  *See Labickas v. Ark. State Univ.*, 78 F. 3d 333, 334–35 (8th Cir. 1996) (dismissal of pendant state claims without prejudice following dismissal of claims over which original jurisdiction exists is the "normal practice" (quoting *Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir. 1981)).

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Defendants' motion to dismiss the Amended Complaint [ECF No. 35] is **GRANTED** as follows:

1.   All claims except Claim IX for alleged violations of the Minnesota Government Data Practices Act are **DISMISSED WITH PREJUDICE**; and

2.   Claim IX for alleged violations of the Minnesota Government Data Practices Act is **DISMISSED WITHOUT PRJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 28, 2019                         s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court